**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. MATTHEW SHERIDAN, Defendant. | No. CR07-4010-MWB **REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On April 18, 2007, the defendant Matthew Sheridan was indicted on one charge of conspiracy to manufacture and distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, after previously having been convicted of a felony drug offense. (Doc. No. 1) On July 9, 2007, Sheridan filed a motion to suppress evidence. (Doc. No. 23) The plaintiff (the Government) resisted the motion on July 16, 2007 (Doc. No. 26), and Sheridan filed a reply on July 26, 2007 (Doc. No. 28).

Pursuant to the trial management order (Doc. No. 8), motions to suppress in this case were assigned to the undersigned for consideration and the filing of a report and recommended disposition. Accordingly, the undersigned held a hearing on the motion on August 6, 2007, at which Assistant U.S. Attorney Forde Fairchild appeared on behalf of the Government, and Sheridan appeared in person with his attorney, Alfred E. Willett. The Government offered the testimony of Travis Jerome Sheridan. One exhibit was admitted into evidence, to-wit: Cutty's Okoboji Resort Club Member Handbook, consisting of 31 pages.

The court has considered the evidence and the parties' arguments, and provides the following report and recommendation on Sheridan's motion to suppress.

The facts underlying Sheridan's motion are undisputed by the parties. Travis Sheridan ("Travis") is the defendant Matthew Sheridan's nephew. Travis stated he and Sheridan have had a very close relationship throughout Travis's life. The two have gone hunting, boating, and fishing together, and Travis referred to Sheridan as his "favorite uncle."

On July 20, 2006, Travis was doing an internship as a security officer/park ranger at Cutty's Okoboji, a private membership resort in the area of Lake Okoboji, Iowa. Previous to this date, on July 4, 2006, Travis had seen Sheridan at Cutty's with his R.V. Travis stated his uncle had stayed at the resort for two weeks, during which Travis made numerous stops at Sheridan's R.V. to talk with him about family matters and social matters. On July 20th, Travis was walking up to the lodge at Cutty's on his lunch break when he saw a Chevrolet Tahoe in the parking lot that he recognized, by the vehicle's appearance and its license plates, as Sheridan's vehicle. Travis walked around the resort looking for his uncle. He stated he loves Sheridan and enjoys his conversation, and he had no other intent in looking for Sheridan than to talk with him. Travis walked around the pool area, the men's locker room area, and the miniature golf area, but did not see his uncle in any of those locations.

As Travis was walking back toward the lodge from the miniature golf area, he saw Sheridan come out of the pool area, walking toward the Tahoe. Travis explained that the pool at the resort is in the center of the lodge, surrounded by a series of rooms located around the pool. Travis began walking toward the area from which he had seen Sheridan emerge, and he saw Sheridan enter one of the poolside rooms. Travis thought Sheridan had entered Room 104, so he walked to that room and knocked on the door leading to the room from the pool area. When he received no response, Travis used a master key,[1]

---

[1] Travis testified all of the security personnel at Cutty's carry master keys to enter any of the rooms at the resort. He stated the resort's managers and maintenance manager also carry master keys.

2

opened the door, and yelled, "Matt?" thinking his uncle might be in the bathroom. No one was in the room, and Travis thought his uncle might have exited the room through a second door that leads to the parking lot. He opened the second door and looked out, but he still did not see Sheridan. Travis stated the only thing he smelled inside Room 104 was chlorine, which he attributed to the room's proximity to the pool.

Travis went back upstairs in the lodge to the member service desk, where he looked at a chart on the wall to determine which room Sheridan was in.[2] He noted his uncle was in Room 105, rather than Room 104, so he walked back down and knocked on the poolside door to Room 105. When he did not receive a response, he opened the door to Room 105 using his master key. Travis indicated he opened the door about one-and-a-half to two feet when the door was slammed shut in his face. During the few seconds the door had been open, Travis observed a bottle that was cut in half with a tube coming down from the bottle. In addition, he believed he smelled anhydrous ammonia.

After the door had been closed for a few seconds, it reopened and Sheridan came outside. Sheridan told Travis he "didn't need to be here right now." Travis asked Sheridan what he was doing, and Sheridan replied that he was "hurting for money." Travis stated he was in conflict about what to do as a result of what he had seen. In an attempt to extricate himself from the encounter gracefully, he asked his uncle if he "knew anything," indicating toward the room. Travis stated he had obtained marijuana from his uncle on occasion in the past, and asking him if he "knew anything" was their shorthand for whether his uncle knew where Travis could obtain marijuana. Travis stated Sheridan told him to stop back by in half an hour.

Travis went to the guard house, where he met his wife, who had just arrived, and gave her his paycheck. He did not tell his wife anything about what he had seen. He

---

[2]Travis stated that if someone stops at the member service desk and asks where to locate a guest of the resort, the resort will give out the information regarding which room an individual has rented.

3

stated he was still trying to decide what to do. Travis called his college criminal justice instructor, who also is Assistant Chief of the Estherville Fire Department, and asked for his advice. His instructor told Travis that he already knew what to do, and he needed to "do the right thing." Travis then called his supervisor at Cutty's to discuss the matter, and his supervisor told him to call the Sheriff's office immediately. Travis said something like, "It's my uncle," and his supervisor stated that did not matter; he still needed to call law enforcement right away.

At the time of these events, Travis was a student at Iowa Community College studying criminal justice, with a view toward becoming a juvenile probation officer after completion of his degree. His coursework included a course on drugs. Travis testified he ultimately decided to report what he had seen to law enforcement for two reasons. First, he believed it was the "right thing to do." Second, he feared that if he did not make the report, it could affect his ability to become a juvenile probation officer in the future. Travis indicated he was upset that his uncle was placing his, Travis's, future in jeopardy by engaging in criminal activities at the resort.

Travis went into the lodge and spoke with the general manager, Ruth Doyle (phonetic). He told her he believed there was a methamphetamine lab in Room 105, and suggested they probably should evacuate the pool area, where about thirty children were playing. However, Travis feared if they evacuated the pool area, Sheridan would discover that they were notifying the authorities. Ruth dialed the Sheriff's office and handed the phone to Travis, who reported what he had seen and his suspicions. The deputy asked Travis the basis for his suspicions, and Travis stated he had been through hazardous materials training through the fire department, and he was in a criminal justice program. He described the bottle, tubing, and smell of anhydrous ammonia. The deputy took Travis's cell phone number and called him back a few minutes later to ask for the best route to enter the resort without Sheridan knowing the officers were on the grounds.

By this time, Travis's supervisor had arrived and was keeping watch on the door to Room 105. Law enforcement officers arrived at the northwest corner of the resort, in the maintenance area, which is blocked from view of the pool area by parked campers. Cutty's employees carry radios for communication purposes, and Travis heard on his radio that Sheridan was carrying items from Room 105 to his vehicle. One of the officers started running back to the road to be sure there was an officer located there to intercept Sheridan if he left the grounds. Travis turned the matter over to the officers. He did nothing further with regard to the investigation. Officers subsequently searched Room 105, obtained incriminating post-*Miranda* statements from Sheridan, and obtained search warrants for Room 105 and Sheridan's vehicle.

The Member Handbook for Cutty's (Gov't Ex. 1) was admitted into evidence over defense counsel's objection. In the handbook, members are advised that Cutty's guests "have no expectation of privacy from search and seizure," and the resort may allow law enforcement officers into a guest's room at any time without notice. (Gov't Ex. 1, ¶ 29) Travis testified each member is given a copy of the handbook at the time they join the resort; however, he had no specific knowledge that Sheridan received, or had read, the handbook.

Travis described his previous involvement with government agencies. He stated he had performed volunteer security work on behalf of the Estherville, Iowa, Police Department on one occasion in 2006, during the Register's Annual Great Bike Ride Across Iowa (RAGBRAI), which went through Estherville that year.

Travis testified he also was (and is) a volunteer fire fighter in Estherville, Iowa. As part of his training and experience with the Estherville Volunteer Fire Department, Travis has been trained in identifying and dealing with methamphetamine labs, and prior to the events in this case, he had been involved personally with three methamphetamine labs, two in wooded areas and one in a vehicle. In addition, Travis has had training in

5

hazardous materials awareness and operations. He is certified as a Fire Fighter I and II, is a training officer with the fire department, and responds to all types of calls.

Travis indicated Cutty's security guards do not carry weapons of any kind, handcuffs, Tazers, or similar law enforcement equipment. He testified that at the time of these events, he was on his lunch break. In searching for his uncle and entering Rooms 104 and 105, he was not acting on behalf of Cutty's or on behalf of any law enforcement agency, nor was he acting with the intent to assist law enforcement. He simply was looking for Sheridan to talk with him, in the context of their relationship as uncle and nephew.

Sheridan argues that even though Travis was acting as a private citizen, his training and experience, and his position of employment with Cutty's, rendered his intrusion into Sheridan's room a violation of the Fourth Amendment to the United States Constitution. He argues the intrusion into his room was unlawful, and was tantamount to a warrantless search. He notes that a private citizen would not have had a passkey to the guest rooms at the resort, and would not have been able to check the records to determine someone's location within the resort. (*See* Doc. Nos. 23-2 & 28)

The Government responds that Travis was acting on his own behalf as a private citizen, and because there was no government action, no constitutional violation occurred. (*See* Doc. No. 26-2)

The question before the court is whether Travis Sheridan's entry into Room 105 was unlawful. If it was, then evidence seized from the room and Sheridan's vehicle, and Sheridan's statements on the scene to law enforcement officers, may be subject to suppression as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-88, 83 S. Ct. 407, 415-18, 9 L. Ed. 2d 441 (1961).

The law applicable to this issue is well settled. "[T]respassing by a private citizen does not constitute a search or seizure within the context of the fourth amendment unless

6

the informant is an agent or instrument of the government." *United States v. Malbrough*, 922 F.2d 458, 462 (8th Cir. 1990) (citing *United States v. Jacobsen*, 466 U.S. 109, 115, 104 S. Ct. 1652, 1657, 80 L. Ed. 2d 85 (1984)); *accord United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004) (citing *Malbrough*). The following factors are critical to determining whether a private citizen was acting as a government agent: (1) "whether the government had knowledge of and acquiesced in the intrusive conduct"; (2) "whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes"; and (3) "whether the citizen acted at the government's request." *Smith*, 383 F.3d at 705 (citing, *inter alia*, *Malbrough*, 922 F.2d at 462); *accord United States v. Huber*, 404 F.3d 1047, 1053-54 (8th Cir. 2005) (citing *Smith*). An additional consideration may be "whether the government offered a reward" for the information. *Malbrough*, 922 F.2d at 462 (citing *United States v. Koenig*, 856 F.2d 843, 847 (7th Cir. 1988)).

In the present case, there is no evidence whatsoever that (1) the government knew of and acquiesced in Travis's conduct in entering Sheridan's room; (2) Travis intended to assist law enforcement agents; (3) Travis acted at the government's request; or (4) there was any reward or other benefit Travis was seeking when he entered the room. The court finds Travis acted solely on his own behalf for the purpose of locating his favorite uncle to have a chat with him. Although Travis's decision to report Sheridan's activities "may have been motivated, to some extent, by an urge to help the government, either as a means of protecting [himself] . . . or by the 'simple but often powerful convention of openness and honesty[,]' . . . this is not enough to make [him] a government agent." *Huber*, 404 F.3d at 1054 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S. Ct. 2022, 2049, 29 L. Ed. 2d 564 (1971); *Malbrough*, 922 F.2d at 462).

For these reasons, the court recommends Sheridan's motion to suppress be **denied**. Any party who objects to this Report and Recommendation must serve and file specific,

7

written objections by **August 20, 2007**. Any response to the objections must be served and filed by **August 23, 2007.**

IMPORTANT NOTE: Any party planning to lodge any objection to this report and recommendation must order a transcript of the hearing **by August 16, 2007**, <u>**regardless of whether the party believes a transcript is necessary to argue the objection**</u>. If an attorney files an objection to this report and recommendation without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 15th day of August, 2007.

*[signature: Paul A. Zoss]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT