**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MATTHEW SHERIDAN,<br><br>    Defendant. | No. CR07-4010-MWB<br><br>**ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
 *A.  Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
 *B.  Objections To Findings Of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . 9
   *1. Travis's recognizing Sheridan's vehicle* . . . . . . . . . . . . . . 9
   *2. Cutty's Member Handbook* . . . . . . . . . . . . . . . . . . . . . 9
   *3. Travis's intent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *4. Government's argument* . . . . . . . . . . . . . . . . . . . . . . 11
   *5. Government's action* . . . . . . . . . . . . . . . . . . . . . . . . 11
 *C.  Objection To Legal Conclusions* . . . . . . . . . . . . . . . . . . . . . . . . 12

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On February 23, 2007, an indictment was returned against defendant Matthew Sheridan charging him with manufacturing and attempt to manufacture 5 grams or more of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846, and with possession of a firearm after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9) and 924(a)(2).[1] On July 9, 2007, defendant Sheridan filed a motion to suppress. In his motion, defendant Sheridan seeks to suppress evidence found during searches of his room at a private resort. Defendant Sheridan argues that a security officer at the resort, who was also defendant Sheridan's nephew, unlawfully entered his room without a search warrant in violation of the Fourth Amendment of the United States Constitution. In addition, defendant Sheridan challenges the legality of all subsequently obtained search warrants, arguing that the search warrants were tainted by the prior illegality of the prior warrantless search of his room.

Defendant Sheridan's motion to suppress was referred to Chief United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). Judge Zoss conducted an evidentiary hearing and then filed a Report and Recommendation in which he recommends that defendant Sheridan's motion to suppress be denied. Judge Zoss concluded that the security guard at the private resort was acting on his own behalf as a private citizen when he entered defendant Sheridan's room and, as such, there was no government action giving rise to a constitutional violation. Therefore, Judge Zoss recommended that defendant Sheridan's motion to suppress be denied. Defendant Sheridan

---

[1] The court notes that the Report and Recommendation incorrectly states the date of the indictment and the charges facing defendant Sheridan in this matter.

has filed objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Sheridan's motion to suppress.

### *B. Factual Background*

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> Travis Sheridan ("Travis") is the defendant Matthew Sheridan's nephew. Travis stated he and Sheridan have had a very close relationship throughout Travis's life. The two have gone hunting, boating, and fishing together, and Travis referred to Sheridan as his "favorite uncle."
>
> On July 20, 2006, Travis was doing an internship as a security officer/park ranger at Cutty's Okoboji, a private membership resort in the area of Lake Okoboji, Iowa. Previous to this date, on July 4, 2006, Travis had seen Sheridan at Cutty's with his R.V. Travis stated his uncle had stayed at the resort for two weeks, during which Travis made numerous stops at Sheridan's R.V. to talk with him about family matters and social matters. On July 20th, Travis was walking up to the lodge at Cutty's on his lunch break when he saw a Chevrolet Tahoe in the parking lot that he recognized, by the vehicle's appearance and its license plates, as Sheridan's vehicle. Travis walked around the resort looking for his uncle. He stated he loves Sheridan and enjoys his conversation, and he had no other intent in looking for Sheridan than to talk with him. Travis walked around the pool area, the men's locker room area, and the miniature golf area, but did not see his uncle in any of those locations.
>
> As Travis was walking back toward the lodge from the miniature golf area, he saw Sheridan come out of the pool area, walking toward the Tahoe. Travis explained that the pool at the resort is in the center of the lodge, surrounded by

3

a series of rooms located around the pool. Travis began walking toward the area from which he had seen Sheridan emerge, and he saw Sheridan enter one of the poolside rooms. Travis thought Sheridan had entered Room 104, so he walked to that room and knocked on the door leading to the room from the pool area. When he received no response, Travis used a master key, opened the door, and yelled, "Matt?" thinking his uncle might be in the bathroom. No one was in the room, and Travis thought his uncle might have exited the room through a second door that leads to the parking lot. He opened the second door and looked out, but he still did not see Sheridan. Travis stated the only thing he smelled inside Room 104 was chlorine, which he attributed to the room's proximity to the pool.

Travis went back upstairs in the lodge to the member service desk, where he looked at a chart on the wall to determine which room Sheridan was in. He noted his uncle was in Room 105, rather than Room 104, so he walked back down and knocked on the poolside door to Room 105. When he did not receive a response, he opened the door to Room 105 using his master key. Travis indicated he opened the door about one-and-a-half to two feet when the door was slammed shut in his face. During the few seconds the door had been open, Travis observed a bottle that was cut in half with a tube coming down from the bottle. In addition, he believed he smelled anhydrous ammonia.

After the door had been closed for a few seconds, it reopened and Sheridan came outside. Sheridan told Travis he "didn't need to be here right now." Travis asked Sheridan what he was doing, and Sheridan replied that he was "hurting for money." Travis stated he was in conflict about what to do as a result of what he had seen. In an attempt to extricate himself from the encounter gracefully, he asked his uncle if he "knew anything," indicating toward the room. Travis stated he had obtained marijuana from his uncle on occasion in the

4

past, and asking him if he "knew anything" was their shorthand for whether his uncle knew where Travis could obtain marijuana. Travis stated Sheridan told him to stop back by in half an hour.

Travis went to the guard house, where he met his wife, who had just arrived, and gave her his paycheck. He did not tell his wife anything about what he had seen. He stated he was still trying to decide what to do. Travis called his college criminal justice instructor, who also is Assistant Chief of the Estherville Fire Department, and asked for his advice. His instructor told Travis that he already knew what to do, and he needed to "do the right thing." Travis then called his supervisor at Cutty's to discuss the matter, and his supervisor told him to call the Sheriff's office immediately. Travis said something like, "It's my uncle," and his supervisor stated that did not matter; he still needed to call law enforcement right away.

At the time of these events, Travis was a student at Iowa Community College studying criminal justice, with a view toward becoming a juvenile probation officer after completion of his degree. His coursework included a course on drugs. Travis testified he ultimately decided to report what he had seen to law enforcement for two reasons. First, he believed it was the "right thing to do." Second, he feared that if he did not make the report, it could affect his ability to become a juvenile probation officer in the future. Travis indicated he was upset that his uncle was placing his, Travis's, future in jeopardy by engaging in criminal activities at the resort.

Travis went into the lodge and spoke with the general manager, Ruth Doyle (phonetic). He told her he believed there was a methamphetamine lab in Room 105, and suggested they probably should evacuate the pool area, where about thirty children were playing. However, Travis feared if they

5

evacuated the pool area, Sheridan would discover that they were notifying the authorities. Ruth dialed the Sheriff's office and handed the phone to Travis, who reported what he had seen and his suspicions. The deputy asked Travis the basis for his suspicions, and Travis stated he had been through hazardous materials training through the fire department, and he was in a criminal justice program. He described the bottle, tubing, and smell of anhydrous ammonia. The deputy took Travis's cell phone number and called him back a few minutes later to ask for the best route to enter the resort without Sheridan knowing the officers were on the grounds.

By this time, Travis's supervisor had arrived and was keeping watch on the door to Room 105. Law enforcement officers arrived at the northwest corner of the resort, in the maintenance area, which is blocked from view of the pool area by parked campers. Cutty's employees carry radios for communication purposes, and Travis heard on his radio that Sheridan was carrying items from Room 105 to his vehicle. One of the officers started running back to the road to be sure there was an officer located there to intercept Sheridan if he left the grounds. Travis turned the matter over to the officers. He did nothing further with regard to the investigation. Officers subsequently searched Room 105, obtained incriminating post-*Miranda* statements from Sheridan, and obtained search warrants for Room 105 and Sheridan's vehicle.

The Member Handbook for Cutty's (Gov't Ex. 1) was admitted into evidence over defense counsel's objection. In the handbook, members are advised that Cutty's guests "have no expectation of privacy from search and seizure," and the resort may allow law enforcement officers into a guest's room at any time without notice. (Gov't Ex. 1, ¶ 29) Travis testified each member is given a copy of the handbook at the time they join the resort; however, he had no specific knowledge that Sheridan received, or had read, the handbook.

6

> Travis described his previous involvement with government agencies. He stated he had performed volunteer security work on behalf of the Estherville, Iowa, Police Department on one occasion in 2006, during the Register's Annual Great Bike Ride Across Iowa (RAGBRAI), which went through Estherville that year.
>
> Travis testified he also was (and is) a volunteer fire fighter in Estherville, Iowa. As part of his training and experience with the Estherville Volunteer Fire Department, Travis has been trained in identifying and dealing with methamphetamine labs, and prior to the events in this case, he had been involved personally with three methamphetamine labs, two in wooded areas and one in a vehicle. In addition, Travis has had training in hazardous materials awareness and operations. He is certified as a Fire Fighter I and II, is a training officer with the fire department, and responds to all types of calls.
>
> Travis indicated Cutty's security guards do not carry weapons of any kind, handcuffs, Tazers, or similar law enforcement equipment. He testified that at the time of these events, he was on his lunch break. In searching for his uncle and entering Rooms 104 and 105, he was not acting on behalf of Cutty's or on behalf of any law enforcement agency, nor was he acting with the intent to assist law enforcement. He simply was looking for Sheridan to talk with him, in the context of their relationship as uncle and nephew.

Report and Recommendation at pp. 2-6 (footnotes omitted). Upon review of the record, the court adopts all of Judge Zoss's factual findings that have not been objected to by defendant Sheridan.

## II. LEGAL ANALYSIS

### A. Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

FED. R. CIV. P. 72(b).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*). As noted above, defendant Sheridan has filed objections to Judge Zoss's Report and

8

Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Sheridan's motion to suppress.

### B. Objections To Findings Of Fact

#### 1. *Travis's recognizing Sheridan's vehicle*

Defendant Sheridan initially objects to Judge Zoss's finding that: "On July 20th, Travis was walking up to the lodge at Cutty's on his lunch break when he saw a Chevrolet Tahoe in the parking lot that he recognized, by the vehicle's appearance and its license plates, as Sheridan's vehicle."[2] Report and Recommendation at 2. This factual finding is fully supported by the testimony of Travis Sheridan at the evidentiary hearing, in which Travis Sheridan testified as follows:

> Q. At some point did you take a break?
> A. I was getting ready to take a break at that point. Yeah, I was.
> Q. Tell me what happened.
> A. I was down by the paddle boats, and I was walking up to the lodge on the north parking lot at that time, and I seen my uncle's Tahoe sitting in the parking lot with Emmet County license plates.

Transcript at 14. Therefore, this objection is overruled.

#### 2. *Cutty's Member Handbook*

Defendant Sheridan next objects to Judge Zoss's finding that:

---

[2] The court notes that defendant Sheridan inexplicably fails to explain the reasoning behind any of his objections to Judge Zoss's factual findings. Moreover, although defendant Sheridan identifies each of the segments of Judge Zoss's Report and Recommendation to which he objects, he does not specifically identify that portion of the record which he believes supports an alternative finding nor does he even suggest in what way Judge Zoss's factual finding is purportedly incorrect.

9

> The Member Handbook for Cutty's (Gov't Ex. 1) was admitted into evidence over defense counsel's objection. In the handbook, members are advised that Cutty's guests "have no expectation of privacy from search and seizure," and the resort may allow law enforcement officers into a guest's room at any time without notice. (Gov't Ex. 1, ¶ 29)

Report and Recommendation at 5. Again, this factual finding is fully supported by the record. Cutty's Member Handbook, which was admitted into evidence over defendant Sheridan's objection, provides in pertinent part as follows:

> 29. The Club may authorize law enforcement agencies to search any area of the resort and Members, their family and guests have no expectation of privacy from search and seizure.
>     . . . .
> 34. The Club reserves the right to enter any portion of the property to the extent necessary to carry out needed duties. This includes the right to enter a rental unit without permission in the case of an emergency that threatens life or property at the resort.

Government Ex. 1, Cutty's Member Handbook at ¶¶ 29, 34. Therefore, this objection is also overruled.

### 3. *Travis's intent*

Defendant Sheridan also objects to Judge Zoss's finding that:

> [Travis Sheridan] testified that at the time of these events, he was on his lunch break. In searching for his uncle and entering Rooms 104 and 105, he was not acting on behalf of Cutty's or on behalf of any law enforcement agency, nor was he acting with the intent to assist law enforcement.

Report and Recommendation at 6. The court again finds that these factual findings by Judge Zoss are fully supported by the record. Travis Sheridan testified at the suppression hearing as follows:

10

> Q. Why did you look for him?
> A. Well, I just wanted to talk to him. I mean, he--I love him. He's one of my favorite uncles. I mean, I enjoy his conversations very much.

Transcript at 14. He also testified in pertinent part as follows:

> Q. When you went into and encountered your uncle, were you doing Cutty's business at the time?
> A. No, I was not.
> Q. Were you doing government's business at the time?
> A. No, I was not.

Transcript at 43. In addition, Travis Sheridan testified that he had never received training from law enforcement personnel, and was not personally acquainted with any members of the local law enforcement agencies. *See* Transcript at 28, 33-34. Therefore, this objection is also overruled.

### 4. *Government's argument*

Defendant Sheridan further objects to Judge Zoss's statement that:

> The Government responds that Travis was acting on his own behalf as a private citizen, and because there was no government action, no constitutional violation occurred.

Report and Recommendation at 6. This was not a factual finding by Judge Zoss but rather Judge Zoss's recounting of the government's argument on the central issue. Moreover, defendant Sheridan does not disclose why he views this summation as being incorrect. From the court's review of the record, the court concludes that Judge Zoss's summation of the government's argument in this case was spot on. Therefore, this objection is also overruled.

### 5. *Government's action*

Defendant Sheridan further objects to Judge Zoss's statement that:

11

> In the present case, there is no evidence whatsoever that (1) the government knew of and acquiesced in Travis's conduct in entering Sheridan's room; (2) Travis intended to assist law enforcement agents; (3) Travis acted at the government's request; or (4) there was any reward or other benefit Travis was seeking when he entered the room. The court finds Travis acted solely on his own behalf for the purpose of locating his favorite uncle to have a chat with him.

Report and Recommendation at 7. For the reasons stated above in regard to defendant Sheridan's objection concerning Judge Zoss's finding concerning Travis's intent, the court finds that this portion of Judge Zoss's Report and Recommendation is fully supported by the record in this case. Therefore, this objection is also overruled.

### C. Objection To Legal Conclusions

Defendant Sheridan also objects to Judge Zoss's legal conclusion that Travis Sheridan was not acting in the capacity of a government agent or other instrument of the government when he entered defendant Sheridan's room, and therefore there was no resulting constitutional violation which would warrant suppression of the evidence in this case.

"A search by a private citizen is not subject to the strictures of the Fourth Amendment unless that private citizen is acting as a government agent." *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004), *cert. denied*, 126 S. Ct. 1567 (2006); *accord United States v. Huber*, 404 F.3d 1047, 1053 (8th Cir. 2005) ("A private citizen's conduct can nonetheless implicate the Fourth Amendment if the private citizen is acting as a government agent."); *United States v. Malbrough*, 922 F.2d 458, 461-62 (8th Cir. 1990) ("[Trespassing by a private citizen does not constitute a search or seizure within the context of the fourth amendment unless the informant is an agent or instrument of the

12

government."), *cert. denied*, 501 U.S. 1258 (1991). The Eighth Circuit Court of Appeals has identified several factors which must be considered by a court in determining whether a private individual is acting as an agent for the government:

> We look to several factors in determining whether a private citizen was acting as an agent of the government. Chief among these are whether the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes; and whether the citizen acted at the government's request.

Smith, 383 F.3d at 705; *accord Huber*, 404 F.3d at 1053 (quoting *Smith*); *Malbrough*, 922 F.2d at 462.

Here, upon *de novo* review of the record, the court concludes that there is no evidence that any law enforcement office or government agency requested Travis Sheridan to enter defendant Sheridan's room, or even knew about it beforehand. Moreover, there is no evidence in the record that any law enforcement office or government agency encouraged Travis Sheridan to enter defendant Sheridan's room. In addition, it is clear that Travis Sheridan entered defendant Sheridan's room for his own purposes-to have a friendly conversation with one of his favorite uncles and not with the intent to assist law enforcement officers. The fact that Travis Sheridan, after coming across evidence of a working methamphetamine lab only feet away from a swimming pool filled with dozens of children, was "motivated in part by a desire to aid law enforcement does not in and of itself transform [him] into a government agent." *Smith*, 383 F.3d at 705. Accordingly, the total lack of government involvement in Travis Sheridan's actions and the complete lack of any government knowledge concerning Travis Sheridan's actions leads the court to conclude that no agency relationship existed between Travis Sheridan and any law

13

enforcement office or government agency, thus rendering this a private search outside of Fourth Amendment protections. Therefore, this objection is overruled.

### *III. CONCLUSION*

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendant Sheridan's motion to suppress.

**IT IS SO ORDERED.**

**DATED** this 7th day of September, 2007.

*[Signature: Mark W. Bennett]*

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

14